# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 22-320 (JMC)** |
| | ) | |
| **ANTONIO LAMOTTA,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DEFENDANT'S MOTION TO DISMISS THE INFORMATION

The defendant, Antonio Lamotta, files this motion to dismiss the Information filed against him on September 27, 2022 (ECF No. 11), pursuant to Fed. R. Crim. P. 12(b).  For the reasons discussed below, these counts fail to state an offense and fail to give proper notice to the defendant.[1]  In addition, Mr. Lamotta also makes facial constitutional challenge to count four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. §5104 (e)(2)(G).[2]

---

[1] Mr. Lamotta understands that many courts in this jurisdiction have denied similar motions to dismiss over the past year. *See United States v. Griffin*, 549 F. Supp. 3d 49 (D.D.C. 2021); *United States v. Sandlin*, 2021 WL 5865006 (D.D.C. Dec. 10, 2021); *United States v. Caldwell*, 2021 WL 6062718 (D.D.C. Dec. 20, 2021); *United States v. Mostofsky*, 2021 WL 6049891 (D.D.C. Dec. 21, 2021); *United States v. Montgomery*, 2021 WL 6134591 (D.D.C. Dec. 28, 2021); *United States v. Nordean*, 2021 WL 6134595 (D.D.C. Dec. 28, 2021); *United States v. McHugh*, 2022 WL 296304 (D.D.C. Feb. 1, 2022); *United States v. Andries*, 2022 WL 768684 (D.D.C. Mar. 14, 2022); *United States v. Puma*, 2022 WL 823079; *United States v. Bingert*, 2022 WL 1659163 (D.D.C. May 25, 2022); *United States v. Antony Vo*, 1:21-cr-509 (TSC); *United States v. Nassif*, 1:21-cr-421 (JDB), ECF No. 42.

[2] This argument is similar to the one made in *United States v. John Maron Nassif*, 21-cr-421 (JDB), where the Court denied a similar motion.

## BACKGROUND

On August 8, 2022, Mr. Lamotta was charged with alleged violations of 18 U.S.C. §1752(a)(1) and (2), and 40 U.S.C. §5104 (e)(2)(D), and (G). *See* ECF Dkt. No. 1. The government then filed an Information alleging the same charges on September 27, 2022. *See* ECF Dkt. No. 11. This matter is currently scheduled for a bench trial on August 14, 2023.

The government alleges that Mr. Lamotta illegally entered the Capitol grounds and Capitol building on January 6, 2021. *See* ECF No. 1, Statement of Facts. The government further alleges that Mr. Lamotta engaged in disorderly conduct while at the Capitol and that he illegally paraded, demonstrated and picketed inside the Capitol building. *Id.*

## LEGAL AUTHORITY

[The charging document] must be a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). It "must provide the defendant sufficient detail to allow him to prepare a defense, to defend against a subsequent prosecution for the same offense, and to ensure that he be prosecuted upon facts presented to the grand jury." *United States v. Apodaca*, 275 F. Supp. 3d 123, 153 (D.C. Cir. 2017) (citing *Russell v. United States*, 369 U.S. 749 (1962), and *Stirone v. United States*, 361 U.S. 212 (1960)). A criminal defendant "may raise by pretrial motion any defense, objection, or request that the Court can determine without a trial on the merits." Fed. R. Crim. P.

12(b)(3).  Rule 12 provides that a defendant may also move to dismiss the [charging document] for "failure to state an offense" and "lack of specificity."  Fed. R. Crim. P. 12(b)(3)(B)(iii),(v).

A criminal statute is unconstitutionally vague if it "fails to give ordinary people fair notice of the conduct it punishes, or is so standardless that it invites arbitrary enforcement." *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)).  "The touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259 (1997).  The "void-for-vagueness doctrine" protects against arbitrary or discriminatory law enforcement. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (citing *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)).

The rule of lenity applies if the terms of the statute are ambiguous; once it is determined that a statute is ambiguous, the rule of lenity "requires that the more lenient interpretation prevail." *United States v. R.L.C.*, 503 U.S. 291, 293 (1992). This rule is rooted in "the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." *Id.* at 305 (quoting *United States v. Bass*, 404 U.S. 348, 336 (1971)).  The Courts have "[r]eserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute." *Id.* (citing *Moskal v. United States*, 498 U.S. 103, 108

3

(1990)).  "Whether a statutory term is unambiguous … does not turn solely on

dictionary definitions of its component words.  Rather, 'the plainness or ambiguity

of statutory language is determined [not only] by reference to the language itself,

[but as well by] the specific context in which that language is used, and the broader

context of the statute as a whole.  *Yates v. United States*, 574 U.S. 528, 537 (2015)

(quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

**ARGUMENT**

I.     <u>18 U.S.C. §1752 fails to state an offense</u>

    **a. The United States Secret Service is the Entity that May Designate "Restricted Areas" Under the Statute, Not the United States Capitol Police**

Mr. Lamotta is charged with two counts of violating 18 U.S.C. §1752 for

"entering and remaining in a Restricted Building or Grounds," and engaging in

"disorderly and disruptive conduct in a Restricted Building or Grounds."  *See* ECF

Dkt. No 1.  When this statute was enacted, it is clear that the purpose was to

designate the United States Secret Service ("USSS") to restrict areas for temporary

visits by the President.  *See* S. Rep. No. 91-1252 (1970).  At the time of enactment,

the USSS was part of the Treasury.  Section 1752 grants the Treasury Secretary the

authority to "designate by regulations the buildings and grounds which constitute

the temporary residences of the President."  18 U.S.C. §1752(d)(1).  It also allows

the Secretary to "to prescribe regulations governing ingress or egress to such

buildings and grounds to be posted, cordoned off, or otherwise restricted areas

4

where the President may be visiting." §1752(d)(2).  There is nothing in the

legislative history (or the statutory language) to suggest that anyone other than the

USSS has the authority to so restrict the areas surrounding the Capitol building.

The USSS's duties and responsibilities are outlined in 18 U.S.C. §3056, which

include:

> (e)(1): When directed by the President, the United States
> Secret Service is authorized to participate, under the
> direction of the Secretary of Homeland Security, in the
> planning, coordination, and implementation of security
> operations at special events of national significance, as
> determined by the President.
>
> (2) At the end of each fiscal year, the President through
> such agency or office as the President may designate,
> shall report to the Congress--
>
> -   what events, if any, were designated special events of
>     national significance for security purposes under
>     paragraph (1); and
>
> -   the criteria and information used in making each
>     designation.

§3056(e)(1)(2)(A)(B).  The statute does not state that any other agency is permitted

to designate events for security purposes and only explains that the USSS would be

under the designation of the Department of Homeland Security instead of the

Treasury Department.  The statute makes the exclusive role of the USSS even

clearer in §3056(g), which states:

> (g) The United States Secret Service shall be maintained
> as a *distinct entity* within the Department of Homeland
> Security and shall not be merged with any other
> Department function. *No personnel and operational*

5

> *elements of the United States Secret Service shall report to an individual other than the Director of the United States Secret Service*, who shall report directly to the Secretary of Homeland Security without being required to report through any other official of the Department.

(emphases added).

### b. The Government Does Not Allege that the Secret Service Restricted the Capitol Grounds on January 6, 2021

The Information charges Mr. Lamotta with remaining or entering "restricted building or grounds," however it does not allege that the USSS designated that area as being restricted. Nor could it do so now because in *United States v. Griffen*, the government conceded that it was the United States Capitol Police that attempted to designate the area as restricted that day and not the USSS. 21-CR-92 (TNM) at Dkt. No. 33.[3] The court in *Griffen* (as well as other district courts) denied a motion to dismiss a §1752 charge on the ground that the statute (Congress) did not specifically state who must designate the "restricted areas." *Id.* at Dkt. No. 41.

However, the plain language of 18 U.S.C. §1752(c)(B), defines "restricted building or grounds" as a "building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." Since it is the Secret Service who protects the President or "other person," it is the Secret Service who must designate the area "restricted." The legislative history bolsters this

---

[3] There have also been many January 6 trials where US Capitol Police officers have testified that they were the entity that restricted the area surrounding the Capitol grounds and not the United States Secret Service.

interpretation.[4]

The court in *Griffen* also hypothesized that the President would be unable to rely on the military fortification at Camp David already in existence when he visits that facility if the Secret Service was the only entity with the statutory authority to restrict the area. *See Griffen* ECF Dkt. No. 41 at pg. 11. However, Camp David is a military installation and is not a "public forum" that needs an entity to "cordon off" areas and restrict them in light of a Presidential visit. Military bases have security and are not otherwise open to the public. And each military installation is subject to other laws that protect the facility, and those within it, from intruders. *See, e.g.,* 18 U.S.C §1382 (barring any person from entering any military installation for any purpose prohibited by law). Military bases are heavily guarded and have entrance and exit points and are different than federal buildings that need sections to be "cordoned" off in order for the general public to know which area is restricted. For these reasons, the example offered by the *Griffen* court is inapposite and does not support the court's decision.

Furthermore, if a deficiency in a statute creates an absurd result or creates arbitrary enforcement, it should not be enforced until it is amended to provide

---

[4] Congress enacted 18 U.S.C. §1752 as part of the Omnibus Crime Control Act of 1970. Public Law 91-644, Title V, Sec. 18, 84 Stat. 1891-92 (Jan 2. 1971). At that time, the USSS was a part of the Treasury Department. The Senate Judiciary Committee report accompanying the current version of §1752 noted that there was no federal statute that specifically authorized the Secret Service to restrict areas where the President maintains temporary residences and the senators explained that the key purpose of the bill was to provide that authority to the Secret Service. S. Rep. No. 91-1252 (1970).

clarity and provide fair notice to a defendant. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). The *Griffen* court's reasoning creates a different kind of absurd result – viz, anyone claiming to be a part of law enforcement could post a sign designating an area as restricted and a criminal defendant could then be penalized for trespassing because they "willfully" ignored the sign.

### c. Even if the Capitol Police were Authorized to Restrict the Grounds, 18 U.S.C. §1752 is Not Applicable Because Former Vice President Pence Was not "Temporarily Visiting" the Capitol Building on January 6, 2021

Under the plain language of 18 U.S.C. §1752, the statute does not apply here. Section 1752 prohibits conduct in or near "any restricted building or grounds." The statute expressly defines the term "restricted buildings or grounds" as follows:

(1) the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—

> (A) of the White House or its grounds, or the Vice President's official residence or its grounds;
>
> (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or
>
> (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance.

18 U.S.C. § 1752(c); *see United States v. Samira Jabr*, Criminal No. 18-0105, Opinion at 12, ECF No. 31 (May 16, 2019), *aff'd*, 4 F.4th 97 (D.C. Cir. 2021).

Counts one and two of the Information charge Mr. Lamotta with conduct "in a restricted building and grounds, that is, any posted, cordoned-off and otherwise

restricted area *within the United States Capitol and its grounds, where the Vice President was temporarily visiting . . ." See* ECF No. 11, (emphasis added).  The government's attempt to shoehorn Mr. Lamotta's conduct into the statute fails.  Accordingly, those two counts should be dismissed.

The "United States Capitol and its grounds" do not automatically constitute "restricted buildings or grounds" under any prong of § 1752(c)(1). Nor did the Capitol grounds become "restricted grounds" on January 6, 2021, because of a "temporary vice-presidential visit," as the government asserts in the Information.

The plain meaning of "temporary" is "lasting for a time only."  Black's Law Dictionary (11th Ed. 2019).  "Visiting" is defined as "invited to join or attend an institution for a limited time." Merriam-Webster (2021).  Together, the phrase "temporarily visiting" connotes temporary travel to a location where the person does not normally live or work on a regular basis.

The former Vice President was not "temporarily visiting" the Capitol on January 6, 2021.  The Capitol is a federal government building in the District of Columbia, where he lived and worked.  Moreover, he actually worked at the Capitol Building and grounds—it was his place of employment.  In his official capacity as the "President of the Senate," he had a permanent office "within the United States Capitol and its grounds."  The Vice President was not "visiting" the Capitol Building, he was working there, carrying out his sworn official duties to by "presiding," over the vote count ceremony.  *See* 3 U.S.C. § 15 ("Congress shall be in

9

session on the sixth day of January succeeding every meeting of the electors. The Senate and House of Representatives shall *meet* in the Hall of the House of Representatives at the hour of 1 o'clock in the afternoon on that day, and *the President of the Senate shall be their presiding officer*.") (emphasis added).

Past cases support this plain, common-sense reading of the statute, as they involve conduct in and near areas where the President and Vice President were clearly "temporarily visiting." *See, e.g., United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005) (defendant entered and remained in a restricted area at an airport in South Carolina where the President was visiting for a political rally); *United States v. Junot*, 902 F.2d 1580 (9th Cir. 1990) (defendant pushed his way through a restricted area where then Vice President George Bush was speaking at a rally at a park in Los Angeles that was secured by United States Secret Service agents); *Blair v. City of Evansville, Ind.* 361 F. Supp.2d 846 (S.D. Indiana 2005) (defendant charged with 18 U.S.C. §1752 at protest during then Vice President Richard Cheney's visit to the Centre in Evansville, Indiana).  These cases all involve the President and Vice President actually traveling outside of D.C., where they live and work, and "visiting" another location for a "temporary" purpose.  As a result, those cases are entirely consistent with the plain meaning of section 1752(c)(1)(B).

Here, by contrast, former Vice President Pence was not traveling to a speaking event or a political rally.  He was meeting with other government officials in a federal government building where he had a permanent office as part of

10

fulfilling his official duties as Vice President/President of the Senate.  Thus, he was not "temporarily visiting" the Capitol building as required by the plain language of 18 U.S.C. §1752.

Lastly, testimony from past January 6 trials have revealed that the Vice President's visit was not the reason for the expanded restricted perimeter but rather it was due to the inaugural stage in construction, COVID-19 restrictions, and the Electoral Vote Event. *See United States v. Gossjankowski*, 21-cr-123 (PLF), Trial Transcript Volume VI on March 7, 2023, pgs. 1133-34. In *Gossjankowski*, Secret Service Agent Lanelle Hawa testified that the area around the Capitol Building was not specifically restricted because the Vice President was going to be there. *Id*. She also testified that the Vice President does maintain a permanent office in the Capitol building. *Id*. at 1134. Therefore, the government's claim that Mr. Lamotta was inside a restricted area where the Vice President was temporarily visiting is contradicted by the government's own evidence that has shown there were many reasons the area had an expanded perimeter, the temporary visit of the Vice President not being one of them.

For the above reasons, Section 1752 does not apply as charged and Counts One and Two of the Information should be dismissed.

## II.   The Information Fails to Provide Necessary Allegations of Fact to Properly State an Offense under 40 USC §5104 (e)(2)(D) and (G)

Under 40 U.S.C. §5104(e)(2)(D), "an individual or group of individuals may not willfully and knowingly…(D) utter loud, threatening, or abusive language or

engage in disorderly or disruptive conduct with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, any deliberations of, a committee of Congress or either House of Congress…."

The affidavit in support of the criminal complaint alleges that Mr. Lamotta was "part of a group of rioters that pushed past police officers." ECF Dkt. No. 1-1. Besides this bare bones allegation, the government does not allege that Mr. Lamotta specifically engaged in disorderly or disruptive conduct. Simply being in the middle of a crowd that was engaging in disorderly conduct is not sufficient to allege that Mr. Lamotta was engaging in that same behavior. The affidavit also does not allege that Mr. Lamotta was uttering in loud or abusive language. For these reasons, Counts Two and Three of the Information fail to state an offense and should be dismissed.[5]

Similarly, the government fails to state an offense with respect to 40 U.S.C. §5104(e)(2)(G), which makes it an offense to "…willfully and knowingly…(G) parade, demonstrate, or picket in any of the Capitol Buildings." There are no allegations that Mr. Lamotta did anything to parade, picket, or demonstrate. He did not display any signs, chant with other protesters, or make any gestures that he

---

[5] Count Two of the Information charging Mr. Lamotta with engaging in disorderly and disruptive conduct in an otherwise restricted area in violation of 18 U.S.C. §1752(a)(2), also fails to state an offense for the same reasons already stated – that there is no allegation that Mr. Lamotta engaged in any disorderly or disruptive conduct.

was demonstrating. There is actually no allegation that he engaged in any expressive conduct at all. For these reasons, Count Four must be dismissed.

### III.   40 U.S.C. §5104 (e)(2)(G) is Unconstitutionally Vague on Its Face

Mr. Lamotta is charged with violating 40 U.S.C. §5104 (e)(2)(G), which simply states that "An individual or group of individuals may not willfully and knowingly parade, demonstrate, or picket in any of the Capitol Buildings." This statute is overbroad and unconstitutionally vague on its face. Accordingly, this Court should dismiss Count Four of the Information because (1) it violates the First Amendment and (2) fails to put ordinary people on notice of what is prohibited.

#### a.   Section 5104 (e)(2)(G) is substantially overbroad and violates the First Amendment

Section 5104 (e)(2)(G) provides a blank prohibition on all parading, demonstrating, and picketing in a Capitol building and does not have an element of unlawful entry. The plain language of this statute is alarmingly broad and by its own terms covers three modes of First Amendment activity – parading, demonstrating, or picketing. A law may be invalidated as overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (*quoting Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449, n. 6 (2008)). In conducting an overbreadth analysis, a court must first construe the statute. *United States v. Williams*, 553 U.S. 285, 293 (2008). The next

step is to ask whether the statute, properly construed, "criminalizes a substantial amount of protected expressive activity." *Id.* at 297; *United States v. Montgomery*, No. CR 21-46 (RDM), 2021 WL 6134591, at *23 (D.D.C. Dec. 28, 2021).

As an initial matter, Congress itself had concerns that this statute was overbroad when making revisions in 1967. Representative O'Neal expressed his concerns saying he was "a little bit disturbed by the language" that would criminalize parading, picketing, or demonstrating in a Capitol building. Congressional Record-House (October 19, 1967) at 29389.[6] Representative Bingham also expressed concerns about overbreadth:

> I am deeply concerned about the broad scope, vague language, and possible interference with first amendment rights of the bill before us today. It was so hastily conceived and reported out of committee that no official views of the Justice Department or the District government were available. Moreover, there seems to be no disposition on the part of the bill's supporters to accept clarifying amendments.

Congressional Record at 29394. He also commented on the overly broad law's potential impact on peaceful, quiet visitors, describing the law as "a case of using a shotgun to eliminate a gnat." Congressional Record at 29395.

Courts have also made rulings identifying the overbreadth of the language. In *Bynam v. U.S. Capitol Police Bd.*, 93 F. Supp. 2d 50, 53 (D.D.C. 2000), the court found a Capitol police regulation purporting to implement the instant statute to

---

[6] Available at https://www.govinfo.gov/content/pkg/GPO-CRECB-1967-pt22/pdf/GPO-CRECB-1967- pt22-2-1.pdf

violate the First Amendment. The Capitol Police regulation explained that demonstration activity included:

> parading, picketing, speechmaking, holding vigils, sit-ins, or other expressive conduct that convey[s] a message supporting or opposing a point of view or has the intent, effect or propensity to attract a crowd of onlookers, but does not include merely wearing Tee shirts, buttons or other similar articles of apparel that convey a message.

*Id.* (quoting Traffic Regulations for the Capitol Grounds § 158). The plaintiff challenged that regulation, arguing it was unconstitutional, and he succeeded on his motion for summary judgment. The *Bynum* Court reasoned:

> The Court, however, cannot conclude that the regulation is reasonable in light of the purposes it could legitimately serve. While the regulation is justified by the need expressed in the statute to prevent disruptive conduct in the Capitol, it sweeps too broadly by inviting the Capitol Police to restrict behavior that is in no way disruptive, such as "speechmaking… or other expressive conduct…" Traffic Regulations for the Capital Grounds §158. Because the regulations proscriptions are not limited to the legitimate purposes set forth in the statue, it is an unreasonable and therefore an unconstitutional restriction on speech.

*Id.* at 57 (Citations omitted). The court focused on the regulation rather than the statute itself, operating under the premise that the statute was limited to disruptive conduct.

The premise that the statute is limited to disruptive conduct, however, was and remains demonstrably false. The text does not include such a limitation, and the legislative history shows that Congress did not intend to include one. At the time of the 1967 revision, Representative Edwards expressed that he believed the "parading, picketing, or demonstrating" language violated the First Amendment

15

because it was *not* limited to disorderly or disruptive conduct. Congressional Record at 29392. Representative Cramer stated that to add "with intent to disrupt the orderly conduct of official business" would "gut[ ] the section," eliminating any doubt as to whether the failure to include limiting language was inadvertent. *Id.* at 29394.

Perhaps unsurprisingly, the statute continues to give rise to interpretations just like the regulation at issue in *Bynum*. The United States Capitol Police Guidelines now offer the following interpretation:

> Demonstration activity is defined as any protest, rally, march, vigil, gathering, assembly or similar conduct engaged in for the purpose of expressing political, social, religious or other similar ideas, views or concerns protected by the First Amendment of the United States Constitution.[7]

Ironically, the current policy is even broader than the unconstitutional regulation. It still defines demonstration to include virtually all protected First Amendment activity and does not limit its application to disruptive conduct. In *Lederman v. United States*, a district court explained the problem with a similarly broad regulation:

> For instance, assuming that the ban was applied literally and even-handedly, a group of congressional staffers or members of the general public who stood outside the Capitol arguing about the latest campaign finance bill, health care initiative, or welfare reform would presumably be risking citation or arrest for engaging in "expressive

---

[7] United States Capitol Police Guidelines for Conducting an Event on United States Capitol Grounds, *available at* https://www.uscp.gov/sites/uscapitolpolice.house.gov/files/wysiwyg_uploaded/Guidelines%20and%20Application%20for%20Conducting%20an%20Event%20on%20U.S.%20Capitol%20Grounds.pdf (last accessed June 9, 2022).

conduct that conveys a message supporting or opposing a point of view."

89 F. Supp. 2d 29, 41 (D.D.C. 2000), *on reconsideration in part*, 131 F. Supp. 2d 46 (D.D.C. 2001). The same is true here. Law enforcement policy indicates that the prohibition applies to nearly all First Amendment activity, and neither the plain language nor legislative history supports a contrary interpretation. The extraordinary breadth of the language cannot be explained away and should be dismissed as unconstitutionally broad.

### b. Section 5104 (e)(2)(G) is unconstitutionally vague

Section 5104(e)(2)(G) does not put ordinary people on notice of the conduct that it prohibits and as such creates arbitrary and discriminatory enforcement. The vagueness doctrine "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357–58, (1983). "Where a statute's literal scope, unaided by a narrowing [ ] [ ] interpretation, is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974). Thus, in the First Amendment context, a vagueness challenge can be brought even where a defendant may have been on notice that his particular conduct fell within the bounds of the statute. *See Thornhill v. State of Alabama*, 310 U.S. 88, 97-98 (1940).

Ultimately, "any regulation that allows a police officer the unfettered discretion to restrict behavior merely because it 'conveys a message' or because it has a 'propensity to attract a crowd of onlookers' cannot survive a due process challenge." *Bynum*, 93 F. Supp. 2d at 58. Although the *Bynum* court placed the blame on the regulation, holding that the statute itself was constitutional, the current Capitol Police regulation is even less specific than the one in *Bynum*. That highlights how subjective the statutory language is. Evidently, guidance from a federal district court was not enough to narrow the ordinary meaning of the words in the eyes of those charged with enforcing them. It is easy to see why; "demonstrating" is an ambiguous word.

Merriam-Webster defines "demonstration" as, among other things, "an outward expression or display" or "a public display of group feelings toward a person or cause." Even using the narrower definition for the sake of argument, it remains unworkably vague for a criminal statute. Indeed, a child on a field trip remarking "We love our Capitol Police" while on a group tour of the building, or a staffer cheerfully singing "Battle Hymn of the Republic" in the atrium while walking to the office would both appear to be "demonstrating in the Capitol Building" under the dictionary definition.

It is unlikely that children on field trips or singing staffers will be arrested for parading, picketing, or demonstrating. However, "[t]he danger, of course, is that such a broadly-worded ban . . . would be selectively employed to silence those who

18

expressed unpopular ideas regardless of whether the speaker created an obstruction or some other disturbance." *Lederman v. United States*, 89 F. Supp. 2d 29, 42 (D.D.C. 2000), *on reconsideration in part*, 131 F. Supp. 2d 46 (D.D.C. 2001).

The legislative history shows that discriminatory and arbitrary enforcement was anticipated and even intended by some lawmakers. The statutory scheme dealing with conduct in the Capitol Building was revised following a case where Howard University students sat on the floor in response to the Speaker's refusal to commit to taking action on their petition. *Smith v. D.C.*, 387 F.2d 233, 236 (D.C. Cir. 1967). While the D.C. Circuit Court did not address the constitutionality of the federal statute (the government had not invoked it), it did advise the legislature to clarify that area of the law generally: "in view of the confusion apparent in the enforcement of these and related statutes, we commend to executive and legislative authorities a review of this entire area of the law." *Id.* at 237.

In response, Congress acknowledged the confusion-in-enforcement concern and "revise[d] the statutes relating to improper conduct in the Capitol Buildings"; House Report 90-745 noted that recent federal appeals "decisions highlight[ed] the confusion surrounding the existing laws, their implementation and their administration."1967 U.S.C.C.A.N. 1739, 1741. Representative Jerome Waldie expressed his minority view of the law as follows:

> I suggested that the qualifying phrase used in a portion of the misdemeanor section of the act, 'with intent to disrupt the orderly conduct of official business' should have been applied to all conduct

sought to be controlled. The committee did not approve of this limitation. Without such a limitation, in my view, not only does the act become of questionable constitutionality, but it becomes an instrument capable of ensnaring innocent and well-meaning visitors within its provisions.

*Id.* at 1747.

The Congressional Record provides additional insight. Representative Colmer described some additional reason for the amendment, stating that "to be perfectly frank about this bill, it is brought about because of 'the fact that there is another one of the numerous marches upon Washington anticipated here within the next few days."[8] Congressional Record at 29388. Representative Colmer also cited the peaceful actions— sitting outside of a committee room—of the Freedom Democratic Party of Mississippi, which he described as "an extreme leftist group."[9] *Id.* He followed up that statement by contending that the bill at issue would protect the Capitol from "these misguided people who are bent on obstructing if not, in fact, destroying this, the world's most democratic form of government." *Id.* Representative Ryan noted that law seemed "defective on First Amendment grounds" and "vaguely drafted." Congressional Record at 29394.

Whatever the precise contours of the offense are, the plain statutory

---

[8] The March on the Pentagon, a massive protest against the Vietnam War, would take place two days later.

[9] The Freedom Democratic Party of Mississippi was formed as part of Freedom Summer and was supported by Dr. Martin Luther King. *See* "Mississippi Freedom Democratic Party (MFDP)," *King Encyclopedia*; Stanford University Martin Luther King, Jr. Research and Education Institute.

language "forbid[s] all demonstrative assemblages of any size, no matter how peaceful their purpose or orderly their conduct. A statute of that character is void on its face on both First and Fifth Amendment grounds." *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 587 (D.D.C.), *aff'd*, 409 U.S. 972 (1972). Here, with no clarity or specificity as to what is meant by parading, picketing, or demonstrating, the statute fails to put ordinary people on notice of what is prohibited and encourages arbitrary and discriminatory enforcement. *Cf. Thornhill v. State of Alabama*, 310 U.S. 88, 100– 01 (1940) ("The vague contours of the term 'picket' are nowhere delineated."). Accordingly, section 5104(e)(2)(G) is unconstitutionally vague on its face.

## CONCLUSION

For all of reasons discussed above, the Court should dismiss the pending Information against Antonio Lamotta.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/

_____

Maria N. Jacob
D.C. Bar No. 1031486
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500
Maria_Jacob@fd.org

21