# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 22-320 (JMC)** |
| | ) | |
| **ANTONIO LAMOTTA,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DEFENDANT'S MOTION TO DISMISS COUNT ONE OF THE SUPERSEDING INDICTMENT

The defendant, Antonio Lamotta, files this motion to dismiss count one of the Superseding Indictment filed against him on September 29, 2023 (ECF No. 37), pursuant to Fed. R. Crim. P. 12(b). For the reasons discussed below, 18 U.S.C. § 231(a)(3) is unconstitutionally vague and fails to provide sufficient notice. Furthermore, § 231(a)(3) exceeds Congress's Commerce Clause authority. Lastly, the Superseding Indictment does not identify a federally protected function within the meaning of the Civil Disorder statute .[1]

---

[1] Counsel understands that similar arguments have been rejected by several judges in this district court. *See United States v. Nordean*, 579 F. Supp.3d 28 (D.D.C. 2021); *United States v. Bingert et al.*, 605 F.Supp. 3d 111 (D.D.C. 2022); *United States v. Mostofsky*, 579 F. Supp.3d 9 (D.D.C. 2021); *United States v. McHugh*, 583 F. Supp. 3d 1 (D.D.C. 2022). Counsel also understands that this Court has previously denied one of the issues (vagueness) raised in this pleading in *United States v. Samsel*, 21-cr-537 (JMC), ECF No. 240. However, Mr. Lamotta's pleading addresses additional arguments with respect to vagueness and raises a commerce clause argument that, to undersigned counsel's knowledge, has not yet been addressed by this Court.

1

## BACKGROUND

On August 8, 2022, Mr. Lamotta was charged with alleged violations of 18 U.S.C. §1752(a)(1) and (2), and 40 U.S.C. §5104 (e)(2)(D), and (G). *See* ECF Dkt. No. 1. The government then filed an Information alleging the same charges on September 27, 2022. *See* ECF Dkt. No. 11. Trial on these misdemeanor charges was scheduled for the fall of 2023 until the government filed a superseding indictment charging him with a felony count of Civil Disorder in violation of 18 U.S.C. § 231(a)(3) in addition to the above misdemeanor charges. Based on this new felony charge, Mr. Lamotta's trial was postponed until March 11, 2024.

## LEGAL AUTHORITY

A criminal statute is unconstitutionally vague if it "fails to give ordinary people fair notice of the conduct it punishes, or is so standardless that it invites arbitrary enforcement." *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)). "The touchstone is whether the statute, either setanding alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259 (1997). The "void-for-vagueness doctrine" protects against arbitrary or discriminatory law enforcement. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (citing *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)).

The rule of lenity applies if the terms of the statute are ambiguous; once it is

determined that a statute is ambiguous, the rule of lenity "requires that the more lenient interpretation prevail." *United States v. R.L.C.*, 503 U.S. 291, 293 (1992). This rule is rooted in "the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." *Id.* at 305 (quoting *United States v. Bass*, 404 U.S. 348, 336 (1971)). The Courts have "[r]eserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute." *Id.* (citing *Moskal v. United States*, 498 U.S. 103, 108 (1990)). "Whether a statutory term is unambiguous … does not turn solely on dictionary definitions of its component words. Rather, 'the plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole. *Yates v. United States*, 574 U.S. 528, 537 (2015) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

The Commerce Clause prohibits the criminalization of noneconomic intrastate activity unless "the regulated activity 'substantially affects' interstate commerce." *United States v. Lopez*, 514 U.S. 549, 559 (1995).

A "federally protected function" is defined as a "function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof; and such term shall specifically include, but not be limited to, the collection and distribution

of the United States mails." 18 U.S.C. § 232(3).

## ARGUMENT

## I.   18 U.S.C. 231(a)(3) is Unconstitutionally Vague and Fails to Provide Sufficient Notice

A criminal statute is void for vagueness when it (1) "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden," *United States v. Harriss*, 347 U.S. 612, 617 (1954); or (2) "encourages arbitrary and erratic arrests and convictions." *Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972). For two additional reasons, § 231(a)(3) is subject to a particularly high level of scrutiny under this test.  First, it imposes criminal penalties, and "[c]riminal statutes must be scrutinized with particular care" under the vagueness test. *Hill* at 459.  Second, it threatens to interfere with First Amendment rights, which means "a more stringent vagueness test should apply." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

### a. The Statute's Imprecise Language Improperly Hinders a Person of Ordinary Intelligence from Discerning What Conduct it Prohibits

Ordinary citizens are entitled to "be informed as to what the State commands or forbids." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) (citing *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939).  Here, a person of ordinary intelligence must guess at the meaning of §231(a)(3) because it is replete with vague and imprecise terms.  The statute provides:

> "Whoever commits or attempts to commit **any act** to **obstruct, impede, or interfere** with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties **incident to and during the commission of a civil disorde**r which in any way or degree **obstructs, delays, or adversely affects** commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function.."

18 U.S.C. §231(a)(3) (emphases added).

"Any act" can include anything from protected free speech and expressive conduct to an egregious assault.  The most problematic part of the statute, however, is how to decipher what "incident to and during the commission of a civil disorder" means.  The statute defines "civil disorder" as:

> "Any public disturbance involving acts of violence by assemblages of three or more persons which causes an immediate danger of or results in damage or injury to the property or person of any other individual."

18 U.S.C. §232(1).  However, the statute fails to instruct whether a defendant must have participated in that civil disorder and/or how physically close a defendant must be for the conduct to count as "incident to."  Lastly, the statute ends again with the vague words, "in any way *obstructs, delays, or adversely affects* commerce."  This phrase opens the door for endless subjectivity over (1) what constitutions obstruction and/or delay, and (2) what does or does not constitute an "adverse effect," and (3) what is sufficiently material "affect upon commerce" to fall within the proscription of the statute.

5

Unsurprisingly, a South Carolina ordinance with similar language was found unconstitutionally vague in *McCoy v. City of Columbia*, 929 F. Supp. 2d 541, 554 (D.S.C. 2013). That ordinance made it unlawful "for any person to interfere with or molest a police officer." *Id.* Like that ordinance, Section 231 (a)(3) "includes no objective standard to guide the police in determining that conduct constitutes unlawful interference...."*Id.* Because there is no standard to provide such guidance, the statute "authorizes, if not encourages, discriminatory enforcement." *Id.* Similarly, the language of Section 231(a)(3) includes the word "interfere" and there is no standard to guide law enforcement to discern what the word means. Furthermore, the neighboring words in the statute do not make the ambiguous words any more clear; if anything, the other words of the statute increase the confusion.

Section 231(a)(3)'s language requires courts to undertake an indeterminate, "wide-ranging inquiry" that denies defendants fair notice and encourages arbitrary enforcement. *Johnson v. United States*, 576 U.S. 591, 597 (2015). Moreover, it provides no clearly articulated nexus between the act and the "civil disorder." And while Section 232(1) provides a definition of "civil disorder," its definition could apply to virtually any tumultuous public gathering involving more than two people. Because the statute invites the same kind of unwieldy judicial assessment struck down in *Johnson*, Section 231(a)(3) similarly should be held invalid.

Furthermore, by enacting a statute with such imprecise language, Congress

created "a criminal prohibition of alarming breadth." *United States v. Stevens*, 559
U.S. 460, 474 (2010).  *Hill*, supra, the Court found that an ordinance's sweeping
nature was neither "inevitable" nor "essential to maintain public order." 482 U.S. at
464.  Because the ordinance was "not narrowly tailored to prohibit only disorderly
conduct or fighting words," it wrongly gave police "unfettered discretion to arrest
individuals for words or conduct that annoy or offend them." *Id.* at 465.  Similarly,
here, § 231(a)(3) casts far too wide a net.  By expansively encompassing "any act"
that could interfere with the duties of a police officer or firefighter during a civil
disorder, § 231(a)(3) is not limited to "violent acts" or acts that result in bodily
injury or that otherwise put persons or property in imminent danger. *C.f. United
States v. Reese*, 92 U.S. (2 Otto) 214, 221 (1876) ("It would certainly be dangerous if
the legislature could set a net large enough to catch all possible offenders, and leave
it to the courts to step inside and say who could be rightfully detained, and who
should be set at large.").  Moreover, the statute does not weed out those acts with
protected expressive content or those that occur in a traditional public forum.
Instead, § 231(a)(3) reaches a substantial amount of expressive conduct, and
without clear boundaries, the law chills free speech and invites discriminatory
application by law enforcement and the government.

### b. Section 231(a)(3)'s Reliance on Subjective Reactions Renders Violations Unpredictable

Section 231(a)(3) also impermissibly requires individuals to predict how
others will react to their conduct.  If they fail to predict that reaction accurately,

they risk violating the law.  This violates the fair notice requirement under the Due Process Clause.  For example, in *Coates v. City of Cincinnati*, 402 U.S. 611 (1971), the Supreme Court struck down a statute that criminalized conduct "annoying to persons passing by." *Id*. at 614.  The Court reasoned that, while the city was "free to prevent people" from criminalizing certain enumerated conduct, such as "blocking sidewalks" or "littering streets," it could not enforce "an ordinance whose violation may entirely depend on whether or not a policeman is annoyed." *Id*.

Similarly, in *City of Chicago v. Morales*, 527 U.S. 41 (1999), the Supreme Court invalidated a statute that prohibited loitering "with no apparent purpose." *Id*. at 60.  The Court observed that it was "difficult to imagine how any citizen of the city of Chicago standing in a public place with a group of people would know if he or she had an 'apparent purpose." *Id*. at 57.

Here, as in *Coates and Morales*, it is similarly difficult to imagine how an individual could predict the potential consequences of each act he/she commits that is somehow "incident to or during," a "civil disorder."  Indeed, § 231(a)(3) triggers criminal liability whenever the defendant's conduct interferes or impedes with a fireman or police officer performing his official duties.  But a gesture, sign, or other act that distracts one officer and makes him/her feel impeded or interfered with, could have no impact at all on another.  Moreover, the individual's "act" may be "incident to and during" a civil disorder that he/she is not involved in at all. These subjective standards leave much discretion of police and prosecutors to

8

determine whether a particular individual's conduct violates the law, and means that a potential defendant is not provided with fair and sufficient notice of what constitutes unlawful behavior.  Due to this lack of predictability and precision, §231(a)(3) violates the fair notice requirement.

### c.  Section 231(a)(3) Lacks a Scienter Requirement, Which Weighs in Favor of the Law's Unconstitutionality

The Court has repeatedly affirmed that "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Vill. of Hoffman Ests* at 499. But here, there is no such mitigation, because § 231(a)(3) contains no scienter requirement, thus creating 'a trap for those who act in good faith.'" *Colautti v. Franklin*, 439 U.S. 379, 395 (1979) (quoting *United States v. Ragen*, 314 U.S. 513, 524 (1942)).  This absence weighs in further favor of the statute's unconstitutionality.

Additionally, where, as here, individuals must balance multiple factors, and are subject to strict criminal liability when they balance those factors incorrectly, a statute should be held unconstitutional. *See Colautti*, 439 U.S. at 380-95.  In *Colautti*, a Pennsylvania statute required physicians to weigh several variables to determine fetus viability. *Id*.  If the physician made the wrong determination after weighing these variables, the statute imposed strict criminal liability. *Id*. at 395.  The Court struck down the statute, reasoning that "[t]he perils of strict liability [were] particularly acute . . . because of the uncertainty of the viability

determination itself." *Id.*

Here, individuals seeking to exercise their First Amendment rights in political protest must balance several factors. They must consider whether they are sufficiently "incident to" a group of two or more people in a situation amounting to a "civil disorder," whether police or firemen are in the vicinity, and whether "any" of their acts could interfere with "any" police officer's duties, as determined by that officer. If the wrong determination(s) are made, even in good faith, he/she is now subject to criminal liability. To the extent that a scienter requirement is read into the statute, this does not cure the fair notice issue. Instead, this merely leaves police, prosecutors, and judges to decide after the fact whether the statute requires knowledge (and if so, of what) or specific intent (and if so, to do what).

## II.      Section 231(a)(3) exceeds Congress's Commerce Clause Authority

The Commerce Clause prohibits the criminalization of noneconomic intrastate activity unless "the regulated activity 'substantially affects' interstate commerce." *United States v. Lopez*, 514 U.S. 549, 559 (1995). Under the *Lopez* framework, Section 231(a)(3) is an impermissible use of Congress's power that intrudes into the States' enforcement of criminal laws and because it criminalizes activity that lacks a substantial nexus to interstate commerce.

It is an established part of our system that The States are the ones responsible for defining and enforcing criminal law. *Lopez*, 514 U.S. at 561. Congress is only allowed to interfere with that separation of powers in three

categories of activity: (1) the use of channels of interstate commerce, (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce, and directly relevant to this case, (3) those activities that substantially affect interstate commerce." *Id*. Here, only the third factor is applicable.

The Supreme Court in *United States v. Morrison*, 529 U.S. 598, 610-612 (2000), established a test for determining whether a regulated activity "substantially affects interstate commerce." The four-factor test is as follows with direction that the most important factors are the first and the fourth:

> (1) whether the regulated activity is commercial/economic in nature; (2) whether an express jurisdictional element is provided in the statute to limit its reach; (3) whether Congress made express findings about the effects of the proscribed activity on interstate commerce; and (4) whether the link between the prohibited activity and the effect on interstate commerce is attenuated.

*Id*. When evaluating each of the *Morrison* factors, Section 231(a)(3) does not pass a single one.

### a. Section 231(a)(3) does not regulate economic activity

The Civil Disorder statute criminalizes "any act" to obstruct, impede or interfere with a local police officer or firefighter performing lawful duties "incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce." 18 U.S.C. § 231(a)(3). As such, the act of interfering with the duties of a law enforcement officer incident to a civil disorder is not economic in nature and cannot pass the first part of the *Morrison* test.

In *Lopez*, the Supreme Court found that gun possession under the Gun-Free School Zones Act has nothing to do with commerce and is not part of an economic regulatory scheme. *Lopez*, 514 U.S. at 567. *See also Morrison*, 529 U.S. at 617 (holding that a civil remedy for gender-motivated violence under Violence Against Women Act exceeded Congress's commerce authority because it regulated noneconomic activity). In clear contrast to *Lopez* and *Morrison*, an example of an economic scheme that could be federally regulated was a federal law criminalizing the intrastate cultivation of marijuana for personal use. *Gonzalez v. Raich*, 545 U.S. 1, 22-25 (2005) (failure to regulate would leave gaping hole in the Controlled Substances Act).

Here, there is no large economic scheme associated with the interference of state officers and there is no direct connection to commerce or economic activity.

**b.   The second factor of the *Morrison* test also fails because the commercial nexus element in Section 231(a)(3) does not limit the law's reach only to activities that substantially affect interstate commerce**

The Civil Disorder statute references commerce however the commercial nexus element modifies "civil disorder" and not "any act." The statute makes it criminal to:

> Commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder *which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce.*

(Emphasis added). There is no debate that the clause discussing commerce modifies only "civil disorder." Therefore, a defendant could be guilty of §231(a)(3) if he/she's *act* did not impact commerce. Rather, only the civil disorder itself must impact commerce and a defendant could be guilty if he/she interfered with an officer and that this happened to occur incident to a civil disorder.

Most notably, the statute does not require a "substantial" impact on commerce but only that it affect it "in any way or degree." This defies the entire purpose of the Commerce Clause prohibition on interference with state duties unless there is a "substantial" impact on interstate commerce. As such, the second *Morrison* factor fails.

### c.  Congress has not proscribed that the activities regulated under Section 231(a)(3) "substantially affect" interstate commerce

Section 231(a)(3) originated from the Civil Obedience Act of 1968, an Act that tried to inhibit the lawful efforts of many Civil Rights Advocates, including Dr. Martin Luther King Jr. (Pub. L. 90-284, April 11, 1968, Title X; codified at 18 U.S.C. §§ 231(a)(1)-(3)). The politician behind this act, Senator Russell B. Long, often supported legislation inhibiting the civil rights movement based on his strong views that segregation was appropriate and that the movement showed "ingratitude." (106 Cong. Rec. 4183 (Mar. 2, 1960)); (110 Cong. Rec. 7903 (Apr. 14, 1964)). In order to support his proposed amendment, Senator Long discussed, without citation, the "wholesale Negro violence," which he said was "an almost nightly affair in the

streets of our cities." (114 Cong. Rec. 1294-95 (Jan. 29, 1968)). He referenced largescale "riots" as *generally* impeding the flow of goods in interstate commerce. (114 Cong. Rec. 5535-36 (Mar. 6, 1968).

However, Congress chose to define Civil Disorder as involving "acts of violence by assemblages of three or more persons." 18 U.S.C. § 232(1). This is not the "large-scale riots" that Senator Long described. Most importantly, the primary purpose of § 231(a)(3) is to criminalize conduct that interferes with officer duties and does not prioritize the destructive behavior that riots sometimes cause –such as the destruction of property. Rather, the statute criminalizes the actual interference with officers with a requirement that the activity being "incident to and during" a civil disorder. Therefore, Congress has not spoken to how interference with officer duties substantially affects interstate commerce and so the third *Morrison* factor also fails.

**d. The last factor of the *Morrison* test fails because the relationship between 231(a)(3) conduct and any effect on commerce is too attenuated**

Congress's commerce authority is limited and cannot support such attenuated activities to interstate commerce. The statute does not identify a requirement that commerce be affected directly. Rather, a defendant can be convicted if the individual's acts simply interfered with officers "incident to and during," any "civil disorder" that happens to affect commerce "in any way or degree." This indirect and minor potential effect on commerce cannot justify such

14

federal intrusion. *Morrison*, 529 U.S. at 617 (Congress cannot regulate noneconomic criminal conduct based solely on an attenuated argument that the conduct had an "aggregate effect" on interstate commerce). The fourth factor of *Morrison* was identified as being one of the most important and that is to ensure that attenuated impacts on commerce do not lead to a Commerce Clause slippery slope where anything can be described as "affecting commerce." As such, the final and fourth *Morrison* factor is not met.

Therefore, Section 231(a)(3) should be found unconstitutional as it creates an impermissible federal intrusion on the States' rights to regulate local and noneconomic activities.

### III.   <u>The Congressional Certification on January 6, 2021, is not a Federally Protected Function Within the Meaning of Section 231(a)(3)</u>

The superseding indictment does not identify a federally protected function that was affected by the Civil Disorder in Count One. A "federally protected function" is defined as a "function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof; and such term shall specifically include, but not be limited to, the collection and distribution of the United States mails." 18 U.S.C. § 232(3).

The government can no longer argue that the joint session of Congress was the federal function interfered with by the "civil disorder." *See United States v.*

*Nordean*, 21-cr-175 (TJK), ECF No. 263 (Court finds that Congress is not a "department, agency or instrumentality" for purposes of the statute). Rather, In *Nordean*, the Court ruled that the United States Secret Service protection of the Vice President on January 6 was the federally protected function and thus rejected the defense's argument on that basis. *Id.* at 32.

However, this argument forgets that the Secret Service was only there on January 6, 2021, to protect the Vice President and his family and that the Metropolitan Police Department ("MPD") and United States Capitol Police ("USCP") were there for a different purpose. The civil disorder statute criminalizes "the interference with a law enforcement officer engaged in the lawful performance of his/her official duties." Plainly put, a defendant need not be found to have hindered a Secret Service officer from his/her duties on January 6, 2021, to be guilty under this statute. Rather, a defendant only needs to have interfered with any law enforcement officer. MPD and USCP were not working in conjunction with the Secret Service to protect the Vice President and his family. Instead, MPD and USCP had a separate role.

Captain Sean Patton, a supervisor with the USCP testified that on January 6, 2021, he "was responsible for the men and women who were working in the House and Senate Chamber." *United States v. Sheppard*, 21-cr-203 (JDB), Trial Transcript, Day 2 at 121. He further testified that the mission of the USCP is to "protect the Congress, employees, visitors, and facilities so that the Congress can

execute their congressional and legislative duties in a safe, secure, and open environment." *Id*. Members of the USCP had a broad role that day separate and apart from the specific role of the Secret Service, whose sole job was to protect the Vice President. Similarly, MPD was there to assist the USCP and not the Secret Service. Therefore, the government has not identified what federally protected function was adversely affected by the Civil Disorder.

## **CONCLUSION**

For all of reasons discussed above, the Court should dismiss count one of the Superseding Indictment.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____

Maria N. Jacob
D.C. Bar No. 1031486
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500
Maria_Jacob@fd.org