**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **No.   22-cr-320 (JMC)** |
| | ) | |
| **ANTONIO LAMOTTA** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**<u>DEFENDANT'S MEMORANDUM IN AID OF SENTENCING</u>**

Mr. Lamotta is a 65-year-old Veteran of the United States Army who was born in the Philippines but who has resided in the United States ever since he was 15 years old.

Mr. Lamotta exercised his constitutional right to a trial but elected to have a bench trial – making most of the proceedings streamlined and efficient. While he was convicted by the Court, Mr. Lamotta's conduct on January 6, 2021, did not exhibit violence or aggression and his conduct while on pre-trial release in this matter has been exemplary.

When looking at his specific conduct on January 6, 2021, and the rest of the 3553(a) factors, a period of incarceration as the government and probation recommend is not warranted. Mr. Lamotta respectfully requests that the Court impose a probationary sentence.

**<u>BACKGROUND</u>**

Before January 6, 2021, Former President Trump encouraged millions of ordinary Americans to travel to D.C. to attend the "Stop the Steal" rally, where he

would further encourage them to head to the Capitol building to protest the certification of the Electoral College Vote. The former President summoned his supporters to travel to D.C. based on claims that the 2020 Presidential election was "stolen" from him.[1] This claim was repeatedly told to the public beginning immediately after the 2020 election results where the former President even falsely declared victory.[2] The former President led ordinary Americans, like Mr. Lamotta, who were not experts in election law, to believe or suspect, that irregularities existed in the voting practices and that the fraud would be uncovered. He held rallies all over the country, repeating these claims and firing up his base of followers.

So, when the former President invited millions of his supporters to travel to D.C. on the same day as the electoral certification, he gave them false hope that their voices could somehow change the electoral certification results and that they could encourage Republican leaders to reject the votes from states that had claimed voter fraud. Below are examples of some of the political rhetoric that was spreading through the Trump supporter community prior to January 6, 2021 that came directly from former President Trump:

> WE HAVE JUST BEGUN TO FIGHT!!! – **Tweet from Trump on December 12, 2022**.[3]

---

[1] Shivaram, Deepa, *The House Jan. 6 committee releases its final report on the Capitol attack*, NPR, December 22, 2022, available at https://www.npr.org/2022/12/21/1144489935/january-6-committee-full-report-release.

[2] *Id.* at pg. 36 of final report.
[3] Sherman, Amy, *A Timeline of what Trump said before Jan. 6 Capitol riot*, Politifact, The Poyner Insttitute, January 11, 2021, available at https://www.politifact.com/article/2021/jan/11/timeline-what-trump-said-jan-6-capitol-riot/

A great report by Peter. Statistically impossible to have lost the 2020 Election. Big protest in D.C. on January 6th. Be there, will be wild! – **Tweet from Trump on December 19.**[4]

The Justice Department and the FBI have done nothing about the 2020 Presidential Election Voter Fraud, the biggest SCAM in our nation's history, despite overwhelming evidence. They should be ashamed. History will remember. Never give up. See everyone in D.C. on January 6th.[5] – **Trump tweet from December 26, 2022**.

If you are planning to attend peaceful protests in D.C. on the 6th, I recommend wearing a body camera. The more video angles of that day the better. – **retweet by Trump on January 3, 2022.**[6]

If the liberal Democrats take the Senate and the White House – and they're not taking this White House – we're going to fight like hell, I'll tell you right now,"…We're going to take it back." – **Trump's words at a rally in Georgia on January 4, 2021.[7]**

Simultaneously, there were Q'Anon messages that seemed to foreshadow events with no basis in evidence or any support. For example, there was misinformation spreading in these communities that there would be martial law declared on January 6, 2021. Also, the "prophetic" messaging in this network was clear – Biden would not be President. Below are some examples of Q'Anon messages spreading rapidly online prior January 6, 2021:

---

[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*



Nothing will stop us. They can try and try and try but the storm is
here and it is descending upon DC in less than 24 hours…dark to light.
– **Tweet from Ashli Babbit on January 5, 2021, reiterating
Q'Anon ideologies**.[8]

---

[8] Haroun, Azmi, '*Nothing can stop us': Slain Trump supporter tweeted conspiracy theories
and her devotion to Trump in the days before her death,* Business Insider, January 7, 2021,
available at https://www.businessinsider.com/ashli-babbitt-tweeted-qanon-and-trump-
conspiracies-before-capitol-death-2021-
1?_gl=1*1dqlbba*_ga*MTk3MTI5NDExNi4xNjU4ODQyMjkw*_ga_E21CV80ZCZ*MTY3NT
c4MTA0Ny4yLjEuMTY3NTc4MTE4Ny4wLjAuMA..



Not coincidentally, Mr. Lamotta's social media messages displayed at trial mimicked some of these same ideas spread online not only by the former President Trump and other Republican leaders, but also by fringe groups that were able to infiltrate some of the same base of Trump supporters to spread misinformation.

**Procedural History**

Mr. Lamotta was initially charged only with misdemeanor offenses when the government charged him by complaint on August 8, 2022. *See* ECF No. 1. It was not until Mr. Lamotta rejected the plea offer extended by the government that it decided to obtain a Superseding Indictment charging him with felony Civil Disorder. *See* ECF No. 37.

After a bench trial on March 11, 2024, the Court found Mr. Lamotta guilty of Civil Disorder in violation of 18 U.S.C. § 231 (a)(3), Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104 (e)(2)(D), and Parading, Demonstrating, or

Picketing in a Capitol building in violation of 40 U.S.C. § 5104 (e)(2)(G). The Court acquitted Mr. Lamotta of Entering or Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752 (a)(1), and Disorderly or Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752 (a)(2).

After the trial concluded, the Court permitted Mr. Lamotta to remain on the same pre-trial release conditions pending sentencing, which is currently scheduled for July 30, 2024.

## **ARGUMENT**

## I.   **Legal Standard**

The Court is well aware that the Supreme Court's opinions in *Kimbrough v. United* States, 552 U.S. 84 (2007), and *Gall v. United States*, 552 U.S. 38 (2007), have dramatically altered the law of federal sentencing.  While courts must continue to consider the sentencing guidelines, Congress has required federal courts to impose the least amount of imprisonment necessary to accomplish the purposes of sentencing as set forth in 18 U.S.C. §3553(a).[9]  As the Supreme Court made clear in *Kimbrough* and *Gall*, the Sentencing Guidelines are simply an advisory tool to be considered alongside other statutory considerations set forth in 18 U.S.C. §3553(a).

---

[9] Those factors include (a) the nature and circumstances of the offense and history and characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory guideline range; (d) the need to avoid unwanted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to reflect the following: the seriousness of the offense, promotion of respect for the law and just punishment for the offense, provision of adequate deterrence, protection of the public from future crimes and providing the defendant with needed educational and vocational training, medical care, or other correctional treatment.  *See* 18 U.S.C. §3553(a).

In two more summary reversals, the Court further clarified that the Guidelines cannot be used as a substitute for a sentencing court's independent determination of a just sentence based upon consideration of the statutory sentencing factors. *Nelson v. United States*, 129 S. Ct. 890 (2009), 2009 WL 160585 (Jan. 26, 2009); *Spears v. United States*, 129 S. Ct. 840 (2009), 2009 WL 129044 (Jan. 21, 2009). "Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable," the Court held in *Nelson*. 2009 WL 160585, at *1. "The Guidelines are not only *not mandatory* on sentencing courts; they are also not be presumed reasonable." *Id*. At *2. In other words, a sentencing court may not rely on the Sentencing Guidelines range as a default to be imposed unless a basis exists to impose a sentence inside that range. Rather, the court must weigh each of the factors and impose a sentence that constitutes the least amount of imprisonment necessary pursuant to Section 3553(a).

II.  **Imposing a Probationary Sentence is Sufficient, But Not Greater Than Necessary, to Comply with 18.U.S.C. §3553(a).**

a. **Mr. Lamotta's Personal History and Characteristics**

Mr. Lamotta was born in 1959 in Manila, which is the capital city of the Philippines, a country in Southeast Asia. The Philippines is a third world country that was particularly devastated after World War II – requiring major reconstruction efforts that lasted years after the war. While the impoverished country eventually became a democratic constitutional republic, the Philippines certainly had its fair share of political turmoil. In fact, the country was under

7

martial law during the protests that led to the ouster of the administration of Ferdinand Marcos in 1970. Mr. Lamotta vividly remembers these times and observed much of this political turmoil during his adolescent years.

Mr. Lamotta immigrated to America when he was 15 years old and is now a United States Citizen. He finished high school here and joined the military in 1978 serving in the US Army until he was honorably discharged in 1981. After that, he completed one year of foreign service. While in the military, he served as a Draftsman and Illustrator, receiving commendations for his professional artwork. Mr. Lamotta received several decorations and commendation letters, including a certificate of achievement and a certificate of promotion. Mr. Lamotta's artistry is truly remarkable and is a hobby he still practices today. Below are pieces he completed while in the military and while stationed in Germany.





Already having a security and law and order mindset instilled in the military, Mr. Lamotta went on to have a career in security – up until the present day – where he has worked as private security for various high profile individuals as well as companies that provide security as a service. One such company included Nationwide Security. Currently, he is employed with Spartan Security and Investigation.[10]

Mr. Lamotta has resided in Chesapeake, Virginia where he has raised three children who are now adults, ages 19, 21, and 29. Mr. Lamotta is close to his family and helps take care of his mother, who resides in a retirement community. Unfortunately, Mr. Lamotta's father passed away at a young age before he joined

---

[10] The PSR indicates that employment records were requested but have not been received. Undersigned counsel has spoken to his supervisor to verify this employment. He has advised that he is unarmed because of his felony status and provides unarmed security as well administrative work.

the military. Before he passed away, Mr. Lamotta shared a close relationship with his father, who was an architect and also a former Veteran.

### b.  Nature and Circumstances of the Offense

Mr. Lamotta did not have prior intentions on going inside the Capitol building on January 6, 2021, as the evidence at trial showed. While he was unsure as to what would occur that day after all of the misinformation being spread, he did not arrive in D.C. with a pre-determined plan. Rather, his intent was to assist in providing his security services to an organization he believed in – called Veterans for Trump. This group had arranged for a planned event near the Capitol Building at the same time that President Trump spoke at the Ellipse. Mr. Lamotta was used to providing security for one of leaders of Veterans for Trump, Joshua Macias. Mr. Lamotta, however, did not bring any firearms – but rather his presence was intended to deter agitation from certain counter protesters that were expected to be in the area.

It was not until Mr. Lamotta and Mr. Macias concluded their event that they started hearing about the unrest at the Capitol building. That is when they decided go to the Capitol grounds. When they arrived, Mr. Lamotta was clearly assisting Mr. Macias during a recorded speech that was presented as evidence at trial. Even if the Court believes he had a dual purpose for being present, Mr. Lamotta was not aggressively speaking against the government and was rather observing while Mr. Macias was making strong statements.

Even after entering the Capitol building through the east Rotunda doors, Mr. Lamotta was not actively confronting police officers and certainly not causing the ruckus that was occurring at that time. While the Court did not agree and while he respects the verdict, Mr. Lamotta sincerely believed he could assist in some way when he got inside the building. He now understands that he should not have remained inside once he realized the chaos that had ensued and how difficult it was for police officers to extract people from the building. Mr. Lamotta's career in the military and as a security guard gave him a heightened sense of importance that clouded his judgment that day. The fact remains that he did not harm an officer while inside and at one point was actively trying to leave as evidenced by a conversation between him and an officer where both acknowledge it was impossible to leave at that time.

Lastly, Mr Lamotta was only inside of the building for nine minutes and did not advance into the actual Rotunda room, even though he easily could have pushed through that area as hundreds of other individuals did that day.

The government, in its sentencing memorandum, still insists that Mr. Lamotta intentionally pushed against police officers while in the Rotunda lobby. This allegation was contradicted by their own witness at trial, Officer Owens, who testified that Mr. Lamotta was not pushing officers. Incidental contact is far different than actively trying to push. Officer Owens testified that they were all "packed in like sardines," which makes it inevitable that Mr. Lamotta's body would come into contact with others around him. That does not mean he was intentionally

pushing officers. If that was true, the government would have charged him with assault. In addition, locking arms with another individual does not, by itself, indicate any form of "defiance" against police and can equally indicate a desire not to be trampled by an unruly crowd. When taking Mr. Lamotta's overall actions into context, there is no doubt that he was not trying to harm police in any way.

Ever since January 6, 2021, Mr. Lamotta has had perfect compliance with his pre-trial release conditions. During trial, he was respectful to the Court and to the government. This is no surprise after family and friends describe him has being calm and respectful. Mr. Lamotta's sister in law writes to the Court explaining that "he has always had a calm and collected demeanor," and that he "always looks for the good in others." *See* Exhibit 1, Letter from Kimberly Kifus. Mr. Lamotta's brother in law from another marriage also describes Mr. Lamotta as a "gentle giant" who is a great father, son, and husband. *See* Exhibit 2, Letter from Jim Retzke.

Lastly, his younger sister explains to the Court how her older brother 'is always the one helping others rather than the one asking for help." *See* Exhibit 3, Letter from Angelita Paredes Button. She discusses how her older brother has helped her and protected her over the years.

### c. The Need to Promote Respect for the Law, Provide Just Punishment, Protect the Community and Provide Adequate Deterrence, and the Need to Avoid Unwanted Sentencing Disparities

Mr. Lamotta has already experienced the harshest punishment as a result of his conduct in Philadelphia and the instant matter – losing his ability to own a firearm. Naturally, that right has been a significant part of his identity throughout

his career in the military and his past decades of security service. Losing the ability to bear arms is significant punishment that has already provided severe specific deterrence. In addition, Mr. Lamotta is now 65 years old – which indicates his risk of recidivism is substantially lower.

Although there are no cases that are identical, a review of past January 6 sentences imposed for other defendants convicted of similar charges further demonstrates that a significant variance is warranted in the instant case.[11] While these cases resulted in guilty pleas and did not proceed to trial, the conduct is still comparable and shows that Mr. Lamotta's conduct, in most cases, was less aggravating overall.[12]

- *US v. Brian Preller*, 23-cr-045 (TNM): The Court imposed a probationary sentence with 8 months of location monitoring after Mr. Preller pled guilty to Civil Disorder. He was involved in the "heave ho" push against police at the Lower West Terrace Tunnel. Mr. Preller's guideline range was 8-14 months. Mr. Prellar was also a veteran. While the resistance at the Rotunda foyer was also serious, the fight against police at the Lower West Tunnel was far more dangerous and resulted in vicious attacks on police in a more vulnerable area.

---

[11] This case analysis is not meant to suggest that the defense believes incarceration is appropriate in these matters or that the involved allegations were in fact true as undersigned counsel was not counsel in all of these cases. Rather, the analysis is meant to provide a summary of past cases that are relevant for the Court's consideration in this matter.

[12] Undersigned counsel was unable to find a comparable case that proceeded to trial on similar charges and resulted in a conviction on 18 U.S.C. § 231.

- *US v. Larry Giberson*, 23-cr-115 (CJN): The Court imposed a sentence of 2 months' incarceration and 6 months of home detention after Mr. Giberson entered a guilty plea to Civil Disorder. He was at the front of the "heave-ho" pushes against police at the Lower West Tunnel. He encouraged others to join and chanted "Drag them out!" His guideline range was 8-14 months.

- *US v. Anthony Nolf*, 23-cr-162 (BAH):  Mr. Nolf was sentenced to 3 months' incarceration despite the government's request for 11 months' incarceration. He was allegedly involved in adding his body weight to the "heave-ho" push against police in the Lower West Terrace Tunnel. Mr. Nolf was with his minor son at the time. Mr. Nolf entered into a plea agreement where his estimated guideline range was 8-14 months. He also had mitigating factors, including the fact that his young daughter was battling cancer.

- *US v. Derrick Evans*, 21-cr-337 (RCL): Defendant sentenced to 3 months' incarceration after pleading guilty to 18 U.S.C. §231(a)(3). Mr. Evans was a former West Virginia state legislator who joined the push at the Rotunda Doors and live streamed filmed violence against police officers. He urged others around him to "take" the Capitol and yelled that "a revolution has started!" The sentencing guidelines in this case were 0-6 months.

- *US v. Daniel Johnson,* 21-cr-407 (DLF): Defendant sentenced to 4 months' incarceration after pleading guilty to 18 U.S.C. §231(a)(3). Mr. Johnson allegedly pushed against a line of officers who were guarding East Rotunda doors trying to prevent rioters from gaining entry to the building. The

pushing of rioters caused these officers to be sandwiched against the doors and the effort of the rioters were successful as that door was breached. Mr. Johnson also allegedly said afterwards that he was trying to find a way into the Senate Chamber.

The government provided a few comparison cases, however none of those cases are appropriate for comparison when looking at the conduct of each defendant. Firstly, in *United States v. Yvonne St. Cyr*, 22-cr-185 (JDB), the defendant proceeded to a jury trial not a bench trial. This distinction is significant because of the amount of resources that are saved by electing a bench trial where many items are streamlined for efficiency. Secondly, the guideline range in that matter was 27-33 months. While the government addressed that discrepancy, it is still incorrect about the appropriate guideline range in this case as outlined in the defense objections to the Pre-Sentence Report and as outlined below. Furthermore, the most significant difference is that Ms. St. Cyr was encouraging people to push forward at the Lower West Tunnel, which was the location of the most dangerous assaults on police. Lastly, even when she was pushed out of the Capitol building, she tried to push her way back in. While testifying at her own jury trial, Court found her statements not to be truthful. For all these reasons, this is not an appropriate comparison case.

The government also tried to compare Mr. Lamotta to the defendant in *United States v. Julio Baquero*, 21-cr-702 (JEB) who received a sentence of 18 months' incarceration originally (despite the government's request for 27 months),

which was amended to a sentence of time-served after his diagnosis of stomach cancer. Regardless of the amended sentence, the facts are distinguishable in that Mr. Baquero allegedly taunted police calling them "traitors" which is a significant difference and is far more aggravating. In addition, Mr. Baquero allegedly grabbed the hand of an officer carrying a baton. That action alone could have led to an assault charge. In fact, in *United States v. Daniel Gray*, 21-cr-495 (ABJ), the defendant was sentenced to 30 months' incarceration for that very same allegation (guidelines in that case were 41-51 months). Lastly, Mr. Baquero was pushed out of the Rotunda Doors and allegedly hung on to the door refusing to let go.

Most shockingly, the government noted a previous case before this Court where the defendant was actually convicted of assault on an officer. *In United States v. Kaleb Dillard*, 23-cr-49 (JMC), the Court imposed a sentence of 10 months' incarceration after the defendant not only assaulted an officer but also destroyed property by smashing in a window with a metal tool. This case is actually an example of a case that shows why the government's recommendation in this matter is far too excessive. The government tries to account for the disparities by noting Mr. Lamotta's criminal history and his social media comments. Firstly, the guidelines account for Mr. Lamotta's criminal history and the fact that he did not plead guilty because he did not receive a reduction for acceptance points. Secondly, Mr. Lamotta's social media was very close in time to January 6, 2021, which was over three years ago.

Lastly, sentencing Mr. Lamotta to a significant period of incarceration would not serve the purpose of general deterrence. Empirical evidence proves that the certainty of prosecution, rather than the severity of the punishment is the greater deterrent.[13] Similarly situated individuals who have had a history of serving in the military and in law enforcement are particularly deterred because of how much they value law and order. Individuals like Mr. Lamotta have already been deterred by this threat of prosecution.

### III.    Sentencing Guidelines Objections

Probation has incorrectly calculated Mr. Lamotta's guideline range to be 18-24 months. The correct guideline range should be 6-12 months instead.

### a.  Mr. Lamotta's guideline range should not be increased by three levels pursuant to U.S.S.G. §2A2.4 (b)(1)(A) for the offense involving physical contact.

Probation's response to the defense objection is that it does not matter if Mr. Lamotta accidentally bumped into officers while being packed like sardines as long as the offense itself involved some kind of physical contact. In support, probation cites a case that is completely different than the instant matter. *See* ECF No. 71 at 27. In *United States v. Taliafero*, 211 F3d. 412 (7th Cir. 2000), the defendant admitted to intentionally assaulting an officer by throwing urine on him. This urine struck the officer in the face, chest, and arm. *Id*. at 413. So while Mr. Taliafero did not have direct physical contact

---

[13] *See* National Institute of Justice, *Five Things About Deterrence* (June 5, 2016), full article available at https://nij.ojp.gov/topics/articles/five-things-about-deterrence

with an officer, he threw something at an officer on purpose that did. That is entirely different than Mr. Lamotta's case where he had absolutely no intention of touching an officer and was not convicted of assaulting them.

In *Taliafiero*, the court ruled that throwing urine on an officer was physical contact because the meaning of physical contact was akin to a battery, which is defined as "intentional and wrongful physical contact." *Id*. at 415. That "intentional" requirement is not present here and precisely why Mr. Lamotta noted his objection to this enhancement. The sentencing guidelines did not contemplate an enhancement under this provision for accidental touching that did not amount to some kind of battery.

A Florida federal court ruled that the physical contact enhancement was not applicable when the defendant's assault on an officer caused that officer to slap her hand out of the way. *United States v. Dorothy McKeiver*, 982 F. Supp. 842 (M.D. Florida 1997). The Court in *McKeiver* reasoned that the purpose of the enhancement focuses on the nature of the defendant's conduct that led to their conviction and would only apply in the context of "defendant-initiated physical contact." *Id*. at 845. It follows that the defendant must have had some kind of intention to initiate contact with police and that if that contact was accidental it would run afoul the purpose of this enhancement.

For these reasons, this enhancement should not apply and Mr. Lamotta's overall offense level should be 10.

### b. Probation has incorrectly scored Mr. Lamotta's criminal history category

Probation has scored Mr. Lamotta to be in criminal history category III, but he should actually be in category I. Firstly, in paragraph 38 of the pre-sentence report, probation applies one criminal history point for a prior conviction where the sentence imposed was a diversionary disposition. Pursuant to U.S.S.G. § 4A1.2 (a)(f), diversionary dispositions without a finding of guilt or admission of guilt are not counted. In response to this defense objection, probation revised this paragraph noting that it reviewed "available records" and determined the disposition was "based upon a plea of guilty." However, that is still insufficient information to find that this diversionary outcome was based on a *finding* of guilt. There are countless plea agreements that are entered that do not have findings of guilt and are still labeled "plea agreements" where defendants must enter a plea in court. That does not mean there was an actual admission of guilt and often times diversionary dispositions do not contain findings of guilt. Therefore, this criminal history point should not apply.

Mr. Lamotta also disagrees that 3 points should be applied to his prior conviction in Paragraph 39 of the pre-sentence report. In reviewing the sentencing transcript from this case, the court sentenced Mr. Lamotta to a "term of 11 and half months to 23 months with *immediate parole*, plus two years of reporting probation on the first count." This sentence is equivalent to a suspended sentence not a period of incarceration. Mr. Lamotta served approximately 30 days in custody for that

19

matter. Therefore, Mr. Lamotta should receive only one criminal history point pursuant to U.S.S.G. § 4A1.1 (c).

In its final pre-sentence report, probation responded to this defense objection by simply noting that pursuant to U.S.S.G. § 4A1.1(a), a "sentence of imprisonment" refers to the maximum sentence imposed and that points are based on the sentence pronounced not the length of time actually served. However, here, the sentence pronounced was *not* a sentence of incarceration. The sentence pronounced here was for Mr. Lamotta to be on immediate parole, which is different than someone being sentenced to a term of incarceration and getting out earlier on good time. Defense counsel noted that Mr. Lamotta served 30 days because that is the amount of time he served while on pre-trial detention awaiting imposition of sentence. However, the ultimate sentence imposed did not include a period of incarceration. Therefore, he should only receive one criminal history point.

Based on an offense level of 10 and a criminal history category I, Mr. Lamotta's guideline range should be 6-12 months.

## IV.   A Downward Departure Pursuant to U.S.S.G. § 5H1.11 for Military Service is Warranted

The guidelines call for consideration of a downward departure in circumstances like Mr. Lamotta's case where military service, individually or in combination with other characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines. Firstly, Mr. Lamotta was not born in the United States. He immigrated with his family and later became a U.S. citizen. To then make the decision to serve

a country he was not even born in is remarkable. He served in the military for 4 years and was honorably discharged, receiving awards and decorations.

Not only did Mr. Lamotta serve our country honorably, afterwards he made the decision to dedicate his life and career to protecting others as a security specialist. This shows that his entire career has been based on helping others and protecting others – which takes his case outside of the heartland and warrants a departure in this matter.

## CONCLUSION

For the reasons stated above, Mr. Lamotta respectfully requests that the Court grant a significant variance and downward departure based on the factors outlined in 3553(a) as well as the departures available under the Sentencing Guidelines.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Maria N. Jacob
Assistant Federal Public Defender
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500
Maria_jacob@fd.org